# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5603 | **DATE** | 8/30/2002 |
| **CASE TITLE** | SHANNEN POULOS vs. VILLAGE OF LINDENHURST, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' Fed.R.Civ.P. 56(c) motion for summary judgment is granted in part and denied in part. Both parties' motions to strike portions of their opponent's fact statement are denied. Plaintiff's motion for leave to file sur-reply instanter is dismissed as moot. Status hearing set for 9/17/02 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | number of notices | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | SEP 0 3 2002 | | 54 |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | CDY | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| TBK | courtroom deputy's initials | | date mailed notice | | |
| | Date/time received in central Clerk's Office | | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SHANNEN POULOS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 00 C 5603 |
| | ) Paul E. Plunkett, Senior Judge |
| VILLAGE OF LINDENHURST, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff has sued defendants for their alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., 42 U.S.C. § 1983 and state law. The case is before the Court on defendants' Federal Rule of Civil Procedure 56(c) motion for summary judgment. For the reasons set forth below, the motion is granted in part and denied in part.[1]

## Facts[2]

Plaintiff worked for the Village of Lindenhurst from March 1997 until April 3, 2000. (Defs.' LR 56.1(a) Stmt. ¶ 3; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶ 3.) She was a records clerk from March 1997 until October 1997, a community service officer ("CSO") from October 1997 until March 1998, during which time she backed up police officers on traffic stops and calls, and a police officer from

---

[1] The parties have also filed motions to strike, in whole or in part, each other's LR 56.1 fact statements. Because such motions have no basis in either the Federal Rules of Civil Procedure or the Northern District's Local Rules, they are denied.

[2] Unless otherwise noted, the following facts are undisputed.

March 1998 until April 2000. (Defs.' LR 56.1(a) Stmt. ¶¶ 10, 11.) During her tenure with the Village, defendant McKeever was the chief of police, defendants Klahs and Moravec were police commanders and defendant McCameron was a patrol officer. (Id. ¶¶ 4-7, 13.)

Plaintiff says that she was the victim of gender-based harassment throughout her employment with the Village. It started in early 1997, when she was a clerk, and a police officer named Roy McNally would stare at her for twenty minutes at a time. (Id. ¶ 22-23.) He would do this every day that he worked, throughout her six-month tenure as a records clerk. (Id. ¶ 24.)

When she became a CSO in October 1997, plaintiff says she suffered further harassment. Officers McCameron and Soltis, for example, would dump her business cards or the contents of her work bag on the floor. (Id. ¶ 26.) The male officers would also call her out to gory crime scenes and make comments like "[L]et's see if she[] . . . can take it" or "[G]irls don't deal well with blood." (Id. ¶ 39; Defs.' Ex. A, Poulos Dep. at 86-87.) In addition, when stray dogs were housed at the department overnight, the male officers would not take them out for walks. As a result, the kennels, which CSOs were required to clean, would be filthy in the morning. When plaintiff cleaned them, the male officers would say: "[F]emales have a place in this business . . . and that place [is] cleaning kennels and getting coffee and cleaning up . . . messes . . . ." (Defs.' Ex. A, Poulos Dep. at 87-88.) Finally, near the end of her time as a CSO, Officer McCameron sent a message out on the mobile data terminal ("MDT") under plaintiff's name to approximately 100 police agencies, which said: "[C]an't wait to be the real police and not just catch dogs. Can't wait to see some of you folks at training classes. Looking forward to being the real police." (Defs.' Ex. F, McCameron Dep. at 35-37.)

Plaintiff also says the command staff, all of whom were men, harassed her when she was a CSO. She says that Chief McKeever called her to the scene of a suicide, ordered her to check the victim for vital signs and, over her strenuous objection, made her move the coroner's van. (Defs.' LR 56.1(a) Stmt. ¶¶ 45-56.) Later, when she complained to him about that call he told her that she "was going to have to get a tougher skin or [she] wasn't going to make it." (Id. ¶ 57; Defs.' Ex. A, Poulos Dep. at 103.) Moreover, she says that Commander Moravec ordered her to change the flat tire on a squad car and told the male patrol officers "that it would be funny to watch a girl try to change a tire." (Defs.' Ex. A, Poulos Dep. at 83; Defs.' LR 56.1(a) Stmt. ¶ 36.) While she changed the tire, Moravec and the patrol officers made comments like "women aren't mechanics" and "women have no business being in the garage." (Defs.' Ex. A, Poulos Dep. at 84; Defs.' LR 56.1(a) Stmt. ¶ 37.)

According to plaintiff, the discrimination continued when she became a police officer in 1998. She was required to take a swimming test, though male officers were not, and she received less field training than the men. (Defs.' Ex. A, Poulos Dep. at 108, 111-12, 124-25; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 12.)

In the summer of 1998, plaintiff sought advice from Moravec on dealing with the sexual advances of the men she arrested. Afterwards, Moravec told the male officers that she had bragged to him about being propositioned. (Defs.' LR 56.1(a) Stmt. ¶¶ 123-30.) When plaintiff complained to Commander Miller about Moravec's breach of her confidence, Moravec put a rotten banana in her bike patrol helmet and said she was a rollover who couldn't be trusted. (Id. ¶¶ 76, 96-98, 245; Defs.' Ex. A, Poulos Dep. at 151-52.)

In the fall of 1998, an anonymous memo entitled "The Perilous Adventures of Officer Poulos" appeared in the squad room. Plaintiff says the memo made fun of the way she handled various situations, implying that it was more difficult for her to subdue offenders and keep control of situations because of her gender. (Defs.' Ex. A, Poulos Dep. at 272-75.)

In December 1998, plaintiff called for back-up on a vehicle pursuit but no one, including a male officer who was in the neighborhood, responded. (Defs.' LR 56.1(a) Stmt. ¶¶ 262-70.)

In 1999, plaintiff had more problems, particularly with Moravec and McCameron. Moravec put black marker on her sunglasses, so she had black streaks on her face when she responded to calls, tossed lit firecrackers at her or her belongings and, on a number of occasions, said she had a "pussy gun." (Id. ¶¶ 70-74, 78, 92-95, 99, 107-16.) McCameron scratched the word "bitch" into her clipboard and called her a "fucking bitch" when the two got into a fight about the use of a squad car. (Id. ¶¶ 185-219.) After the squad-car incident, which happened in September 1999, McCameron stopped speaking to her and Moravec refused to answer any of her questions or give her overtime work. (Id. ¶¶ 131-32, 225, 261, 283.)

After the squad-car incident, plaintiff also had trouble with Commander Klahs. He stopped answering her questions and, when she contested the insubordination reprimand she received for her actions during the squad-car incident, plaintiff says Klahs told her if she "could not take orders, [she] should put [her] fucking badge on his desk." (Id. ¶ 261; Defs.' Ex. A, Poulos Dep. at 287.) Subsequently, when plaintiff was assigned to share a squad car with McCameron and she got permission from Commander Miller to use another car, plaintiff says Klahs called her "a manipulative bitch" and said that she "wasn't going to get away with it." (Defs.' Ex. A, Poulos Dep. at 228-29.)

-4-

In late 1999, plaintiff says, the other officers started to ostracize her and ignore her requests for back-up. (Id. at 424-26.)

In early 2000, plaintiff says she found Klahs having sex with a woman in a car. When plaintiff told her partner, Officer Soltis, about it, he sent a message to her on the MDT that said: "[M]aybe the next time you see [Klahs], you can give him a match and point out better places where he could fuck his girlfriend." (Id. at 232-38.) When she complained to Soltis about the message, he sent another one to her that was nothing more than the word "fuck" repeated over and over. (Id. at 239-40.)

Plaintiff also said there were other incidents that occurred continuously while she was a Village police officer, most of them involving Moravec. She said he: (1) threw firecrackers at her and, when she complained, told her to stop being such a girl (Defs.' LR 56.1(a) Stmt. ¶¶ 80-84, 86-87); (2) made derogatory comments about women like "women have no place in police work" and "women are weak" (id. ¶ 75); and (3) made offensive comments about her appearance (Defs.' Ex. A, Poulos Dep. at 131-34). He also made her take other officers' calls, saying "Let's pimp the new chick" (Defs.' LR 56.1(a) Stmt. ¶ 85); broke her bike patrol helmet (id. ¶ 100); made fun of the size of her leather jacket and told her she looked like a Barbie doll when she wore it (id. ¶¶ 101-04); and bumped her squad car from behind with his truck while she was doing a DUI stop (id. ¶¶ 117-22). In addition, plaintiff says, the other officers repeatedly referred to her as "the midnight bitch," her requests for additional training were denied and she was disciplined more harshly than her male counterparts. (Id. ¶¶ 171-74, 249-60.)

Plaintiff contends that defendants' actions constitute sexual harassment, gender discrimination and retaliation in violation of Title VII and violated her Fourteenth Amendment rights and her rights under state law.[3]

## The Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. Michal v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. Id.

---

[3]The breakdown of plaintiff's claims is as follows: (1) Count 1 – Title VII harassment, disparate treatment and retaliation claims against the Village; (2) Counts 2 and 3 – 42 U.S.C. § 1983 harassment, failure to train, disparate treatment and retaliation claims against the Village; (3) Count 4 – 42 U.S.C. § 1983 harassment claim against McKeever; (4) Count 5 – 42 U.S.C. § 1983 harassment claim against Klahs; (5) Count 6 – 42 U.S.C. § 1983 harassment claim against Moravec; (6) Count 7 – battery claim against McCameron; (7) Count 8 – assault claim against McCameron; (8) Count 9 – false imprisonment claim against McCameron; (9) Count 10 – intentional infliction of emotional distress claims against the Village, McKeever, Klahs, Moravec and McCameron.

## Discussion

### Title VII – Failure to Exhaust

In the first count of her complaint, plaintiff alleges that the Village violated Title VII by subjecting her to a hostile work environment, treating her less favorably than male officers and retaliating against her for her complaints of harassment and discrimination. Defendants contend that any Title VII claim based on acts that occurred more than 300 days before plaintiff filed her EEOC charge is time-barred. See 42 U.S.C. § 2000e-5(e)(1) (noting that charge instituted with a state or local agency must be filed with the EEOC "within three hundred days after the alleged unlawful employment practice occurred"); (Compl., Ex. A, EEOC Charge (noting that charge was filed with Illinois Department of Human Rights)). Plaintiff says that the harassment and discrimination she suffered were continuing violations of Title VII, and thus, even the events that fall outside of the 300-day period may be considered.

With respect to the harassment claim, the Supreme Court agrees with plaintiff. In a recent opinion, the Court said: "A hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice.'" National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2074 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)). Thus, the Court concluded, as long as "[any] act contributing to the claim occurs within the filing period, the entire time period of hostile environment may be considered by a court for the purposes of determining liability." Id. Because a number of events occurred within the 300-day filing period, we may consider all of the allegedly harassing events, regardless of when they occurred, in connection with plaintiff's hostile environment harassment claim.

The situation is different for plaintiff's Title VII disparate treatment claims, however. Unlike harassment, incidents of disparate treatment do not need to accumulate to be actionable. Rather, the Morgan Court said, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice'" that "starts a new clock" for filing a charge with the EEOC. Id. at 2072-73. Such "discrete discriminatory acts," the Court said, "are not actionable if time-barred, even when they are related to acts alleged in timely filed charges." Id. at 2072. Thus, plaintiff's Title VII disparate treatment claims are time-barred unless she filed a charge of discrimination on each within the 300-day period mandated by the statute.

Plaintiff contends that the Village treated her less favorably than male officers when it: (1) required her to take a swimming test; (2) did not give her complete field training; (3) denied her requests for additional training; (4) disciplined her more harshly than the men; and (5) denied her access to the locker room. (See Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 62, 67, 79, 249-60; Defs.' Ex. A, Poulos Dep. at 109, 111-12.) The burden of proving that plaintiff exhausted her administrative remedies on these claims and timely filed suit rests with defendants. Williams v. Runyon, 130 F.3d 568, 573 (3rd Cir. 1997) (stating that failure to exhaust administrative remedies and untimeliness are affirmative defenses in Title VII cases that defendants must plead and prove); Massey v. Helman, 196 F.3d 727, 735 (7th Cir. 2000) (citing Williams for same proposition in Prison Litigation Reform Act case), cert. denied, 532 U.S. 1065 (2001). The record establishes that the swimming test and the field training both occurred more than 300 days before plaintiff filed her EEOC charge. (See Defs.' Ex. A, Poulos Dep. at 113, 124-25; Compl., Ex. A, EEOC Charge.) Thus, those claims are barred.

It does not, however, establish that plaintiff was barred from the locker room or that her requests for additional training were denied outside of the 300-day window. Moreover, the record refutes defendants' claim that the disparate discipline claim is untimely because it shows that plaintiff received the contested reprimands *within* the 300-day period. (Pl.'s Exs. Opp'n Defs.' Mot. Summ. J., Ex. C, Personnel File at 000626, 000643; Defs.' Ex. A. Poulos Dep. at 416-18.) In short, defendants have not proven that plaintiff failed to timely exhaust her administrative remedies on these claims. Defendants' motion for summary judgment on that basis is, therefore, denied.


## Title VII – Sexual Harassment

We turn now to the merits of plaintiff's Title VII claims. To make a <u>prima</u> <u>facie</u> case on her hostile environment sexual harassment claim against the Village, plaintiff must show that: (1) she was subjected to unwelcome sexual advances, requests for sexual favors or other conduct of a sexual nature; (2) the harassment was based on sex; (3) the harassment unreasonably interfered with her work performance or created an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability. <u>Parkins v. Civil Constructors of Ill., Inc.</u>, 163 F.3d 1027, 1032 (7th Cir. 1996). The Village does not dispute that the first and last elements are met. Thus, we will start with the second.

Though some of the incidents plaintiff cites are plainly based on sex, there is no obvious gender animus in: (1) the McCameron business card and "real police" MDT incidents; (2) the Moravec firecracker, broken bike helmet, sunglasses and squad-car bump incidents; (3) McKeever's orders to plaintiff at the suicide scene; or (4) plaintiff's failure to receive timely back-up. Thus,

-9-

plaintiff must present some evidence from which we can infer that these ostensibly neutral actions were motivated by anti-female bias to satisfy the second element of her prima facie case.

Plaintiff has not carried that burden. She offers no evidence to suggest that females were the only victims of pranks and practical jokes, nor does she refute the testimony of both male and female officers that such pranks were played by, and on, men and women alike. (See Defs.' Ex. G, Albrecht Aff. ¶¶ 9-10 (stating that the officers commonly play jokes and pranks on one another "much as brothers and sisters would"); Defs.' Ex. H, Keller Aff. ¶¶ 9-10 (same); Defs.' Ex. B, Klahs Dep. at 106-07 (stating that Moravec lit firecrackers to scare Klahs); Defs.' Ex. F, McCameron Dep. at 34-35 (stating that Moravec lit fireworks on many occasions).) Plaintiff also has no evidence to suggest that McKeever called her to the suicide scene because of her gender or that her gender was the reason for her unheeded calls for back-up. (See Defs.' Ex. E, McKeever Dep. at 97-99 (stating that it is appropriate for CSO to be present at a crime scene); Defs.' Ex. G, Albrecht Aff. ¶¶ 12, 13 (stating that she has not been given degrading assignments or placed in danger during her tenure as a Village CSO); Defs.' Ex. H, Keller Aff. ¶ 14 (stating that her male colleagues have provided her back-up and support and have never put her in danger during her tenure as a Village police officer).) Because there is no evidence that gender bias motivated these incidents, they cannot be the basis for plaintiff's hostile environment harassment claim.

Nor is there any evidence to suggest that the statements Klahs allegedly made to plaintiff "What the fuck are you doing here" and "Get the hell out of here" — when she found him having sex in his car were motivated by gender animus. (Defs.' Ex. A, Poulos Dep. at 232-38.) Those words may have been offensive to plaintiff, but there is nothing inherently gendered about them. Moreover,

viewed in the context of the entire incident, Klahs' words suggest that he was angry or embarrassed, but not that his feelings were related to plaintiff's gender.

It is also not clear that gender animus motivated all of the "bitch" comments plaintiff cites. During the squad-car dispute, for instance, McCameron called plaintiff "a fucking bitch" and told her to "park the fucking car right now." (Defs.' Ex. A, Poulos Dep. at 316.) Viewed in context, however, those comments do not support an inference of gender bias. Galloway v. General Motors Serv. Parts Operations, 78 F.3d 1164, 1167-68 (7th Cir. 1996) (stating that the term "bitch" must be viewed in context to determine if it indicates gender animus), abrogated on other grounds, National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061 (2002). It is undisputed that McCameron, who was officer-in-charge at the time, uttered those words after plaintiff had repeatedly refused his orders to turn the squad car over to him. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 374-76, 389.) Under those circumstances, his language suggests that he was angry at plaintiff, not that his anger or the dispute itself were related to her gender. Galloway, 78 F.3d at 1167-68 (viewed in context, use of term "sick bitch" did not indicate gender bias). Similarly, the treatment she received from McCameron, Moravec and Klahs after this incident – McCameron stopped speaking to her, Moravec stopped answering her questions and calling her for overtime work and Klahs told her "if [she] could not take orders, [she] should put [her] fucking badge on his desk" – supports the inference that they disliked her or were angry at her, not that they were biased against women.

The situation is different, however, with Klahs' alleged use of the term "manipulative bitch." Shortly after the squad-car dispute, plaintiff and McCameron were assigned to use the same squad car. Though they worked different shifts, being assigned to the same squad meant they would have to interact at shift change. (Defs.' Ex. A, Poulos Dep. at 344-46.) When plaintiff protested to

Miller, he told her to use another car for the night and he would talk to Klahs about the situation the next day. (Id. at 349-50.) The next morning, when Klahs asked plaintiff why she was driving a car to which she was not assigned, she told him that Miller had given her permission to do so. (Id. at 350-51.) Klahs told her that she was "a manipulative bitch," that pulling Miller into the situation would get him into trouble and "just because [she] could twist Larry Miller around [her] finger [didn't] mean [she] was going to get away with it with any of the other command staff." (Id. at 229-30, 351.)

In this context, Klahs' use of the term "manipulative bitch" suggests gender bias. The ability to manipulate others is an unflattering quality stereotypically attributed to women. Because Klahs' comments imply not only that he disliked plaintiff, but that he disliked her because of her "woman faults," it supports an inference of bias. See Galloway, 78 F.3d at 1168 (noting that the word "'bitch' is sometimes used as a label for women who possess such 'women faults' as 'ill-temper, selfishness, malice, cruelty, and spite'") (citation omitted).

The male officers' references to plaintiff as "the midnight bitch" may also suggest gender bias. According to plaintiff, the men told people plaintiff arrested to "consider [themselves] another victim of the midnight bitch" and said "the midnight bitch strikes again" when plaintiff was at the top of the statistics for tickets issued or arrests made. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 171-74; Defs.' Ex. A, Poulos Dep. at 279-80). In those contexts, the term "bitch" could be "a label for [a] wom[a]n considered . . . to be too aggressive or careerist," Galloway, 78 F.3d at 1168, a potential indicator of gender bias.

That brings us to the last "bitch" incident, McCameron scratching the word into her clipboard.[4] Plaintiff does not know when McCameron did it or what, if anything, provoked him to do so. This apparently unprovoked defacement of plaintiff's clipboard, which, in the absence of a contrary explanation from defendants is what we must assume that it was, also supports an inference of gender bias.

In sum, viewed favorably to her, the record suggests that following incidents were based on plaintiff's gender:

**Repeatedly between October 1997 and February 1998:** (1) Roy McNally stared at her and, when she told McKeever, he said it was because she was young and pretty (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 22-24); (2) male police officers called her out to gory scenes and made comments like: "[G]irls don't deal well with blood" (id. ¶¶ 39-40; Defs.' Ex. A, Poulos Dep. at 86-87); (3) male officers did not walk dogs kept overnight at the station and, when plaintiff cleaned the kennels, made comments like: "[F]emales have a place in this business . . . and that place [is] cleaning kennels and getting coffee and cleaning up . . . messes" (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 41-42; Defs.' Ex. A, Poulos Dep. at 87-88).

**January 1998:** Moravec ordered her to change a tire on a squad car and told the male patrol officers "that it would be funny to watch a girl try to change a tire." (Defs.' Ex. A, Poulos Dep. at 83.) While she changed the tire, he and the other officers made comments like "women aren't mechanics" and "women have no business being in the garage." (Id. at 84.)

**Summer of 1998:** When plaintiff sought advice from Moravec about handling the sexual advances of arrestees, he told the male officers that she bragged to him about being hit on by arrestees. (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 123-30, 243-44.) Moravec made plaintiff take other officers' calls, saying: "Let's pimp the new chick." (Id. ¶ 85.)[5]

---

[4]Plaintiff also says that McCameron scratched "I'm gay" into her ticket book. Her deposition testimony, however, makes clear that the clipboard and ticket book incidents are actually one and the same. (See Defs.' Ex. A, Poulos Dep. at 268-70, 367-69.)

[5]In her deposition, plaintiff could not recall when, during her tenure as a police officer, Moravec made that comment. Given that he referred to her as the "new chick," however, it is reasonable to infer that he made it early on in her career as a police officer.

**Fall of 1998:** The anonymous memo entitled "The Perilous Adventures of Officer Poulos" appeared in the squad room and Moravec called plaintiff "Larry[] [Miller's] little princess" after she complained to Miller about Moravec's conduct. (Defs.' Ex. A, Poulos Dep. at 152-53, 272-75.)

**Summer of 1999:** McCameron scratched the word "bitch" into plaintiff's clipboard (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 185-86) and McKeever told dirty jokes (id. ¶¶ 281-82).

**Fall of 1999:** Klahs called plaintiff "a manipulative bitch" because she asked for and received permission from Miller to use a squad car to which she was not assigned. (Defs.' Ex. A, Poulos Dep. at 228-30, 351.)

**Repeatedly between February 1998 and November 1999:** Moravec referred to plaintiff's stomach as a "pussy gut." (Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 70-74.)

**January or February 2000:** Officer Soltis sent two obscene messages to plaintiff over the MDT. (Id. ¶¶ 139-45.)

**Repeatedly throughout plaintiff's tenure as a police officer:** Moravec said that women do not belong in police work, are weak, can't drive (id. ¶ 75); told her "not [to] be such a girl," when she complained about his firecrackers (id. ¶¶ 90-91); told her she looks like a Barbie doll in her leather jacket (id. ¶¶ 101-04); said she had no "ass" or "boobs" and "pretty much look[ed] like a boy" (Defs.' Ex. A, Poulos Dep. at 131-34) and made her take calls that were dispatched to other officers (id. at 148-50). In addition, the male officers referred to her as "the midnight bitch." (Id. at 279-81; Pl.'s LR 56.1(b)(3)(A) Stmt. ¶¶ 171-74.)

Thus, plaintiff has satisfied the second element of the prima facie case

She has also satisfied the third, because the record suggests both that the harassment created an objectively hostile working environment and that plaintiff perceived it as such. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993) (stating that environment must be both objectively and subjectively hostile for harassment to be actionable). Viewed favorably to plaintiff, the record indicates that the male officers, particular Commander Moravec, continually made disparaging comments about women in general and plaintiff in particular, used offensive or obscene language when they communicated with and to describe her, made sexually explicit comments and jokes and that they did so on an almost continual basis. Moreover, plaintiff testified that she felt the

harassment was so severe that it forced her to leave. Taken together, that evidence creates a triable issue of fact on whether the Village violated Title VII by subjecting plaintiff to hostile environment sexual harassment. The Village's motion for summary judgment on this claim is, therefore, denied.

## Section 1983 – Sexual Harassment

Plaintiff also contends that the harassment violated her Fourteenth Amendment rights and asserts a 42 U.S.C. § ("section") 1983 claim against the Village to recover for it. The Village says that a hostile environment sexual harassment claim, as a matter of law, cannot be maintained under section 1983. In support of its argument, the Village cites Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, in which the Supreme Court held that a private sector employee could not assert a section 1985 claim based on a conspiracy to violate Title VII. Allowing section 1985, which confers no substantive rights on private employees, to be used as a vehicle for redressing private employment discrimination, the Court reasoned, would seriously undermine Title VII's comprehensive remedial scheme. Id. at 372-76. Thus, the Court held that Title VII is the exclusive remedy for private employment discrimination. Id. at 378.

Unlike the plaintiff in Novotny, however, the plaintiff in this case is a public employee. A public employee's right to be free from employment discrimination is guaranteed not only by Title VII, but by the Fourteenth Amendment as well. Trigg v. Fort Wayne Cmty. Schs., 766 F.2d 299, 301 (7th Cir. 1985). Because "the Fourteenth Amendment and Title VII . . . grant[] public sector employees independent rights to be free of employment discrimination," our court of appeals held, "[a] plaintiff may sue her state government employer for violations of the Fourteenth Amendment through § 1983 and escape Title VII's comprehensive remedial scheme, even if the same facts would

suggest a violation of Title VII." Id. at 302. Hostile environment sexual harassment is one species of employment discrimination that the Fourteenth Amendment forbids. Bohen v. City of East Chicago, Ind., 799 F.2d 1180, 1185-87 (7th Cir. 1986) (holding that hostile environment "[s]exual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment"). Accordingly, plaintiff is not barred from asserting section 1983 claims against defendants for violating her Fourteenth Amendment rights by subjecting her to hostile environment sexual harassment.

The next question is whether plaintiff has raised a genuine issue for trial on those claims. To prevail on her section 1983 harassment claim against the Village, plaintiff must show that she was deprived of her Fourteenth Amendment rights pursuant to one of its policies, customs or practices. Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Plaintiff's injury was caused by a Village "policy" if: (1) an express policy caused the alleged constitutional violation; (2) there is a practice so widespread and permanent that it constitutes a custom or usage; or (3) the constitutional injury was caused by a person with final policy-making authority. Baxter ex rel. Baxter v. Vigo County Sch. Corp., 26 F.3d 728, 734-35 (7th Cir. 1994). Plaintiff says there is evidence to suggest both that the Village had a permanent practice of harassment and that her injury was caused by officials with final policy-making authority.

The Court disagrees. There is no evidence to suggest that sexual harassment was the norm at the Village police department. Though plaintiff has proffered evidence that suggests she may have been harassed, there is no evidence that any other woman was treated similarly while employed by the Village. In fact, Eunice Keller and Rebecca Albrecht, the only other female Village employees who gave evidence in the case, emphatically deny that they have been harassed. (See generally

-16-

Defs.' Ex. G, Albrecht Aff.; Defs.' Ex. H, Keller Aff.) Thus, the record does not suggest that sexual harassment is so widespread and permanent in the Village police department that it constitutes a policy within the meaning of Monell. (See Defs.' Ex. A, Poulos Dep. at 446-47 (admitting that she has no knowledge about any other incidents of gender-based harassment at the Village police department).)

Nor has plaintiff demonstrated that the injury she suffered was inflicted by a person with final policy-making authority. State law determines who is a policy-maker for section 1983 purposes. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989). Plaintiff has not pointed to any law or ordinance that vests final policy-making authority in the Village police chief or its commanders or facts that suggest such authority, though vested in another person or entity, was delegated to them. Having failed to do so, plaintiff's section 1983 harassment claim against the Village must be dismissed.

Plaintiff also claims that the Village is liable under section 1983 for its failure to train its employees about sexual harassment. A failure to train constitutes a policy within the meaning of Monell only if it "amounts to deliberate indifference to the rights" of the women employed by the Village. City of Canton v. Harris, 489 U.S. 378, 388 (1989). The Village was deliberately indifferent only if it had "actual or constructive notice" that its failure to provide sexual harassment training was likely to result in constitutional violations. Cornfield ex rel. Lewis v. School Dist. No. 230, 991 F.2d 1316, 1327 (7th Cir. 1993). If, however, the alleged inadequacy is so obvious or a pattern of constitutional violations exists, notice is presumed. Id.

As we noted above, there is no evidence of a pattern of constitutional violations in the Village police department. Moreover, the record shows that the Village has had, since 1987, a policy

-17-

prohibiting sexual harassment, a policy that it incorporated into the Village Personnel Code in 1995. (See Pl.'s Exs. Opp'n Defs.' Mot. Summ. J. Ex. K, Pub. Act. 87-1257; id., Ex. L, Ordinance No. 95-5.) In the face of those policies, which subject violators to disciplinary action, the need for sexual harassment training was not such an obvious inadequacy that it constituted deliberate indifference to the rights of female employees. The Village's motion for summary judgment on the section 1983 failure to train claim plaintiff asserts against it is, therefore, granted.

Plaintiff also asserts section 1983 harassment claims against defendants McKeever, Moravec, and Klahs in their individual capacities. Each of these defendants can be held personally liable under section 1983 only if "he caused or participated in [the] alleged constitutional deprivation." Wolf-Lillie v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). A supervisory official "participates" in the deprivation if he "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the deprivation occurs at [his] direction or with [his] knowledge and consent." Crowder v. Lash, 687 F.2d 996, 1005 (7th Cir. 1982). Supervisors act with "deliberate, reckless indifference" if they "know about [their subordinates'] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988).

Viewed favorably to plaintiff, the record supports the inference that all three of these defendants participated in the harassment. The record suggests that Moravec was not only aware of the harassment, but was a prime perpetrator of it. Moreover, though McKeever and Klahs had little personal involvement in the harassment itself, the record suggests that they were aware of it and did nothing to stop it. (See Defs.' Ex. A, Poulos Dep. at 385-87, 400 (stating that plaintiff complained about the harassment to McKeever and Klahs numerous times, but neither took any action to stop

it).) Such tacit approval of their subordinates' conduct is sufficient to expose them to personal liability under section 1983. Jones, 856 F.2d at 992-93.

Moreover, these defendants are not, as they contend, qualifiedly immune from these claims. Qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether the right allegedly violated was clearly established, we cannot view the law in the abstract but must examine it "in relation to the specific facts confronting [defendants] when [they] acted." Colaizzi v. Walker, 812 F.2d 304, 308 (7th Cir. 1987). In 1997, it was well established that the individual defendants' alleged conduct, perpetrating, tolerating or willfully ignoring gender-based harassment, violated the Fourteenth Amendment. Bohen, 799 F.2d at 1185-87 (holding that hostile environment "[s]exual harassment of female employees by a state employer constitutes sex discrimination for purposes of the equal protection clause of the fourteenth amendment" and setting forth criteria for such claims). Defendants' motion for summary judgment on the section 1983 harassment claims plaintiff asserts against McKeever, Klahs and Moravec is, therefore, denied.

## Title VII – Disparate Treatment

Plaintiff also contends that the Village violated Title VII by barring her from the locker room, denying her requests for additional training and disciplining her more severely than her male counterparts. (See Pl.'s Resp. Defs.' Mot. Summ. J. at 14.)[6] To defeat the Village's motion on these

---

[5]Plaintiff also claims that defendants discriminated against her by making disparaging comments about women's abilities and characteristics and subjecting her to hostile environment sexual harassment. (See Pl.'s Resp. Defs.' Mot. Summ. J. at 14; Compl. ¶ 14.) Those arguments

claims, plaintiff must either present some direct evidence of discriminatory intent or comply with the indirect, burden-shifting method of proof articulated in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Cheek v. Peabody Coal Co.</u>, 97 F.3d 200, 203 (7th Cir. 1996). Having no direct evidence of discrimination, plaintiff must satisfy the <u>McDonnell Douglas</u> burden-shifting method of proof if she is to defeat this motion. To do so, she must first establish a <u>prima facie</u> case of discrimination. <u>Von Zuckerstein v. Argonne Nat'l Lab.</u>, 984 F 2d 1467, 1472 (7th Cir. 1993). If plaintiff establishes a <u>prima facie</u> case, the burden of production shifts to the Village to articulate a legitimate, nondiscriminatory reason for the challenged employment decisions. <u>Id.</u> If the Village carries its burden, plaintiff must show that the proffered reasons for the challenged employment decisions are merely a pretext. <u>Id.</u>

To establish a <u>prima facie</u> case on her discrimination claims, plaintiff must show that: (1) she is a member of a protected class; (2) she was meeting the Village's legitimate expectations; (3) she suffered an adverse employment action; and (4) the Village treated similarly situated employees outside the protected class more favorably. <u>Foster v. Arthur Andersen, LLP</u>, 168 F.3d 1029, 1035 (7th Cir. 1999). The Village contends that there is no evidence that plaintiff suffered any adverse employment action.

The term adverse employment action refers only to those actions that cause "a materially adverse change in the terms or conditions of . . . employment." <u>Spring v. Sheboygan Sch. Dist.</u>, 865 F.2d 883, 885 (7th Cir.1989) (emphasis omitted). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or

---

are simply a reiteration of her harassment claim, which is discussed above.

other indices that might be unique to a particular situation." Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993).

Plaintiff says that, in the aggregate, the instances of disparate treatment resulted in a constructive discharge, a recognized adverse employment action. But plaintiff does not have one disparate treatment claim. Rather, each instance of disparate treatment constitutes a separate claim. Morgan, 122 S. Ct. at 2072. Thus, plaintiff must show that she suffered an adverse employment action as a result of each individual action, e.g., that she was constructively discharged as a result of being unable to use the locker room, if she is to defeat the Village's motion.

Plaintiff was constructively discharged only if her working conditions were so intolerable that a reasonable person would have felt compelled to resign. E.E.O.C. v. University of Chicago Hosps., 276 F.3d 326, 331 (7th Cir. 2002). A reasonable person would not have felt compelled to resign simply because: (1) she could not use the locker room; or (2) her requests for additional training were denied; or (3) she was disciplined more harshly than her colleagues. Because plaintiff was not constructively discharged as a result of any of these actions, and she has not identified any other manner in which these actions materially altered the terms or conditions of her employment, the Village's motion for summary judgment on the Title VII disparate treatment claims she asserts against it is granted.

**Section 1983 – Disparate Treatment**

Plaintiff also claims that the Village violated her equal protection rights when it treated her less favorably than her male colleagues.[7] Once again, the Village can only be held liable on these claims if it violated plaintiff's rights pursuant to one of its customs or policies. Monell, 436 U.S. at 694. And, once again, plaintiff has failed to produce any facts to suggest that it did. There is no evidence that the Village has an express policy of disfavoring women, that women are routinely treated less favorably than men such that disparate treatment is a de facto policy of the Village, (see Defs.' Ex. A, Poulos Dep. at 446-47 (admitting that she has no knowledge about any other incidents of gender discrimination at the Village police department), or that the police command staff, who committed these allegedly discriminatory acts, were final policy-makers for the Village. Absent such evidence, plaintiff's section 1983 disparate treatment claims against the Village must be dismissed.

**Title VII – Retaliation**

Plaintiff also says the Village violated Title VII when it retaliated against her for complaining about the harassment. See 42 U.S.C. 2000e-3(a) ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter . . . ."). To defeat the Village's motion on this claim, plaintiff must either: (1) "present direct evidence (evidence that establishes without

---

[7]Plaintiff's section 1983 claims are not subject to the 300-day EEOC filing requirement, but they are governed by a two-year statute of limitations. See Johnson v. Rivera, 272 F.3d 519, 521 (7th Cir. 2001). Thus, the swim test and the abbreviated field training, which are barred from consideration under Title VII, may form the basis for section 1983 claims if they occurred within the limitations period. The record establishes that they did not. (See Defs.' Ex. A, Poulos Dep. at 113, 24-25.) Thus, any section 1983 claims based on those allegedly discriminatory acts are dismissed.

-22-

resort to inferences from circumstantial evidence) that [she] engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [she] complains"; or (2) evidence that she was meeting the Village's legitimate expectations, she engaged in protected activity, and after doing so only she, "and not any similarly situated employee who did not [engage in protected activity], was subjected to an adverse employment action." Stone v. City of Indianapolis Pub. Util. Div., 281 F.3d 640, 644 (7th Cir. 2002), petition for cert. filed, 71 U.S.L.W. 3093 (U.S. June 28, 2002) (No. 02-16). Plaintiff relies solely on the second approach. (Pl.'s Resp. Defs.' Mot. Summ. J. at 15.)

Plaintiff says that most of the department retaliated against her after she told McKeever that the September 1999 squad-car dispute with McCameron constituted sexual harassment.[8] Her fellow patrol officers, she says, ostracized her and ignored her requests for back-up,[9] and Klahs and Moravec ignored her and refused to answer her work-related questions. (Defs.' Ex. A, Poulos Dep. at 424-26.) According to plaintiff, those conditions resulted in her constructive discharge, the requisite adverse job action.

Even if those conditions caused a constructive discharge, an issue we do not decide, plaintiff could not defeat this motion without proof that other officers who did not complain about

---

[8]Plaintiff also says that Moravec retaliated against her after she complained to Commander Miller about his conduct in the fall of 1998 by calling her a "rollover" and putting a rotten banana in her bike patrol helmet. (Defs.' Ex. A, Poulos Dep at 151-52.) However, that discrete act of retaliation, and any other that occurred more than 300 days before plaintiff filed her EEOC charge, is time-barred. Morgan, 122 S. Ct. at 2072.

[9]Elsewhere in her deposition, plaintiff says that the ostracization and lack of back-up were not retaliatory because they predated her sexual harassment complaint. (See Defs.' Ex. A, Poulos Dep. at 46-47.) Because of the confusion on this point, we have given plaintiff the benefit of the doubt and included those actions in the list of retaliatory conduct.

discrimination did not have similar problems. Though plaintiff says that Officers Jantz, Soltis, McCameron and Fikejs ignored several of her requests for back-up after the squad-car dispute, (id. at 435-40), there is no evidence that those officers routinely provided timely back-up to officers who did not complain of discrimination. Moreover, though plaintiff says Klahs and Moravec would not answer her work-related questions or, instead of answering, would tell her to look for the answer in the Commanding Officer's book, she has no evidence that they behaved differently with other officers. Finally, though plaintiff says that many of the officers stopped speaking to her after the squad-car incident, there is no evidence that such treatment was reserved solely for her. Because plaintiff has not offered any evidence from which we can conclude that she was the only Village police officer who received the treatment she claims was retaliatory, her Title VII retaliation claims must be dismissed.

## Section 1983 – Retaliation

Plaintiff also asserts a section 1983 claim against the Village for the alleged retaliation she suffered. Defendants again argue that this claim must be dismissed because Title VII is the exclusive vehicle for addressing retaliation claims. As we noted above, however, conduct that violates Title VII may also form the basis of a public employee's section 1983 claim if that conduct violates the Constitution as well. Trigg, 766 F.2d at 301-02. The problem for plaintiff is that the alleged retaliation does not. To the extent she suffered retaliation, it was because she complained about discrimination, not because she is a woman. Thus, the retaliation does not violate the Fourteenth Amendment. Nor does it violate the First Amendment, as the "content, form, and context" of plaintiff's speech – an informal, inter-departmental complaint that addressed solely her own

-24-

employment conditions – establishes that it was on a matter of personal, not public, concern. Connick v. Myers, 461 U.S. 138, 146-47 (1983) ("When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment."). In short, the alleged retaliation did not violate plaintiff's constitutional rights. She cannot, therefore, use section 1983 to redress it.

## State-Law Claims – Preemption

Plaintiff also asserts a number of state-law claims against the defendants: (1) claims for assault, battery and false imprisonment against McCameron; and (2) claims for intentional infliction of emotional distress ("IIED") against the Village and all of the individual defendants. Defendants contend that all of these claims are preempted by either the Illinois Human Rights Act ("IHRA") or the Illinois Workers' Compensation Act ("IWCA"). We will start with the IHRA.

The IHRA divests courts of jurisdiction over "the subject of an alleged civil rights violation other than as set forth in [the] Act." 775 ILL. COMP. STAT. 5/8-111(C). Both sexual harassment and retaliation for complaining about it are included in the statute's definition of "civil rights violation." 775 ILL. COMP. STAT. 5/2-101(E), 5/2-102(D), 5/6-101(A). According to the Illinois Supreme Court, the IHRA deprives courts of jurisdiction not only over claims that constitute civil rights violations, but also over any tort claim that is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself." Maksimovic v. Tsogalis, 687 N.E.2d 21, 23 (Ill. 1997). Defendants argue that all of the state-law claims asserted against them are

inextricably linked to the civil rights violations plaintiff alleges, and thus, are preempted by the IHRA.

Contrary to defendants' contention, plaintiff's claims against McCameron for assault, battery and false imprisonment are not barred by the IHRA. Those claims, which are based on the squad-car dispute, are not inextricably linked to her claim for sexual harassment. Rather, the facts plaintiff alleges would support assault, battery and false imprisonment claims against McCameron, even if she had never been harassed. Because those tort claims are independent of plaintiff's sexual harassment claim, they are not preempted by the IHRA. Id.

The IIED claims plaintiff asserts against the Village, Moravec and McCameron are also not preempted. If all of the sex-based conduct were removed from plaintiff's IIED claims, she might still have claims against Moravec based on his fireworks and other pranks and against McCameron because of his pranks and his behavior during the squad-car dispute. Moreover, if plaintiff could prove that McCameron and Moravec engaged in that conduct, at least in part, in furtherance of Village business, then the Village is vicariously responsible for their acts. Webb ex rel. Harris v. Jewel Cos., Inc., 485 N.E.2d 409, 411 (Ill. App. Ct. 1985) ("Under the doctrine of *respondeat superior*, an employer may be liable for the negligent, wilful, malicious or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer; however, the employer is not liable to an injured third party where the acts complained of thereby were committed solely for the benefit of the employee."). In short, the record suggests that plaintiff's claims against these three defendants for IIED are independent of her harassment and retaliation claims. Consequently, they are not preempted by the IHRA.

Plaintiff's IIED claims against McKeever and Klahs, however, are another story. The entire basis for those claims is the harassment and retaliation she allegedly endured. Absent the discriminatory conduct, plaintiff would have no IIED claims against these two defendants. Because plaintiff's IIED claims against McKeever and Klahs are inextricably entwined with her sexual harassment and retaliation claims they are preempted by the IHRA. Accordingly, those claims must be dismissed for lack of subject matter jurisdiction.[10]

Even if the state claims against McCameron, Moravec and the Village are not preempted by the IHRA, defendants argue that they are preempted by the IWCA. In relevant part, that statute states: "No common law or statutory right to recover damages from the employer . . . or the agents or employees of . . . [the employer] for injury or death sustained by any employee while engaged in the line of his duty . . . , other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act . . . ." 820 ILL. COMP. STAT. 305/5. Though the language of the statute suggests that it bars intentional tort claims made by one employee against another, the Illinois Supreme Court has expressly held that it does not. Meerbrey v. Marshall Field & Co., Inc., 564 N.E.2d 1222, 1229 (Ill. 1990) (stating that IWCA does not bar "employees from pursuing a common law action against co-employees for injuries arising out of intentional torts.") Thus, plaintiff's state-law claims against McCameron and Moravec are not preempted by the IWCA.

---

[10]We are not persuaded, as plaintiff suggests, that such a ruling makes the Court an outlier in this district. The cases that plaintiff cites for the proposition that "courts in this district have consistently rejected the preemption argument," Pl.'s Resp. Defs.' Mot. Summ. J. at 26, either engaged in no analysis of the issue or used the same analysis we employed but reached the opposite result. In any event, none of those courts applied Maksimovic to a record like that presented here and concluded that the tort claims were not preempted.

That leaves plaintiff's IIED claim against the Village. The statute preempts this claim unless plaintiff can prove that her injury: (1) "was not accidental"; (2) "did not arise from . . . her employment"; (3) "was not received during the course of employment"; or (4) "was not compensable under the Act." Id. at 1226. Plaintiff contends that her injuries were not accidental, and thus, her claim survives.

In this context, an injury is accidental if it is "unforeseen by the person to whom it happens." Id. (internal quotation marks and citation omitted). Plaintiff does not contend that she expected defendants to inflict severe emotional distress upon her. Thus, her injuries were accidental.

That is not the end of the story, however. The Village can be held liable even for accidental injuries if: (1) they were intentionally inflicted upon her by the Village or its alter ego; or (2) the injurious acts were "commanded or expressly authorized" by the Village. Id. There is no evidence that the Village commanded or directed McCameron or Moravec to take these allegedly tortious actions. But plaintiff says the Village's failure to take steps to stop their harassment after she complained about it amounts to authorization of their conduct. See Mobley v. Kelly Kean Nissan, Inc., 864 F. Supp. 726, 730 (N.D. Ill. 1993) (denying motion to dismiss IIED claim against employer on IWCA preemption grounds because "allegations that defendants elected to stand idly by rather than attempt to prevent harassment of which they were aware amounts to an allegation that defendants encouraged and authorized the alleged conduct").

With all due respect to the Mobley court, we disagree. According to the Illinois Supreme Court, only *express* authorization of McCameron and Moravec's conduct will expose the Village to liability. The rationale for the rule is as follows:

-28-

> [T]he same person cannot commit an intentional assault and then allege it was
> accidental. This does not apply when the assailant and the defendant are two entirely
> different people. Unless the employer has commanded or expressly authorized the
> assault, it cannot be said to be intentional from his standpoint any more than from the
> standpoint of any third person.

Jablonski v. Multack, 380 N.E.2d 924, 927 (Ill. App. Ct. 1990) (internal quotation marks and citation

omitted). In other words, the Illinois courts will hold employers liable only for their sins of

commission, not for their sins of omission. The record in this case suggests that the Village may

have been guilty of the latter, by carelessly, or perhaps, recklessly, failing to address plaintiff's

concerns. It does not, however, suggest that the Village is guilty of the former. As such, it cannot

be held liable for its employees' actions on an express authorization theory.

It is also not liable on an alter ego theory. "The correct distinction to be drawn in this class

of cases," the Illinois Appellate Court has said, "is between a supervisory employee and a person

who can genuinely be characterized as the alter ego of the corporation." Id. at 927 (internal

quotation marks and citation omitted). "Status as a foreman, supervisor, or manager alone, without

the authority to make decisions and set policy on behalf of an employer, will not suffice to render

an intentional tortfeasor an alter ego." Crissman v. Healthco Int'l, Inc., No. 89 C 8289, 1992 WL

223820, at *8 (N.D. Ill. Sept. 2, 1992) (internal quotation marks and citation omitted).

Plaintiff has adduced no evidence to suggest that either McCameron or Moravec is the

Village's alter ego. Though Moravec was a member of the command staff and McCameron

exercised supervisory authority when he was officer-in-charge, the record does not disclose the

extent of their authority or the kinds of decisions they were empowered to make. Because there is

no evidence to suggest that these men, "in a practical sense, speak[] for the [Village]," they are not its alter ego. Id. Plaintiff's IIED claim against the Village is, therefore, preempted by the IWCA.[1]

## State-Law Claims -- Merits

We turn now to the merits of plaintiff's state-law claims against McCameron and Moravec. Defendants do not argue that plaintiff's claims against McCameron for assault, battery and false imprisonment fail on the merits. Thus, like defendants, the Court assumes that material factual issues exist on those claims and denies defendants' motion for summary judgment on them.

That leaves plaintiff's IIED claims against McCameron and Moravec. These claims, the parties agree, are subject to the one-year statute of limitations set forth in 745 ILL. COMP. STAT. 10-8/101. Plaintiff filed her complaint on September 12, 2000. Thus, these IIED claims are time-barred unless they accrued on or after September 11, 1999.

Plaintiff says that these claims are subject to the discovery rule, and that the date on which she reasonably should have known that she was injured and that her injury was wrongfully caused is a fact issue for the jury. The Court disagrees. Plaintiff claims that she suffered unrelenting harassment at the hands of McCameron and Moravec from the day she started to work for the Village in March 1997. If that is true, and for the purposes of this motion we must assume that it is, a reasonable person would have known that she had IIED claims against McCameron and Moravec long before September 12, 1999. As a result, plaintiff's IIED claims against these defendants are time-barred.

---

[1]Even if McCameron and Moravec were the Village's alter egos, plaintiff's IIED claim against the Village would still fail on the merits for the reasons discussed below.

Even if they were not, defendants would still be entitled to judgment on them. A claim for IIED requires proof that the defendant's conduct was extreme and outrageous, he intended to cause plaintiff severe emotional distress or knew that it was substantially certain to result and plaintiff did, indeed, suffer extreme emotional distress. Public Fin. Corp. v. Davis, 360 N.E.2d 765, 767 (Ill. 1976). "A claim for intentional infliction of emotional distress . . . requires more than what is required for sexual harassment." Piech v. Arthur Andersen & Co., S.C., 841 F. Supp. 825, 831 (N.D. Ill. 1994). The challenged conduct must be so outrageous and extreme "as to go beyond all possible bounds of decency" and the resulting distress "so severe that no reasonable [person] could be expected to endure it." Public Fin. Corp., 360 N.E.2d at 767 (internal quotation marks and citations omitted). The Illinois courts have limited recovery on this tort to victims of only the most intolerable conduct. Compare Pavilon v. Kaferly, 561 N.E.2d 1245, 1251-52 (Ill. App. Ct. 1990) (upholding IIED claim asserted against defendant who knew plaintiff was susceptible to emotional distress, repeatedly propositioned her and offered her money for sex, fired her when she refused his advances, threatened to kill and rape her, harassed her family and psychotherapist, threatened to challenge custody of her child, and harassed her new employer with letters, phone calls and spurious complaints to government officials) with Miller v. Equitable Life Assur. Soc'y, 537 N.E.2d 887, 888-90 (Ill. App. Ct. 1989) (plaintiff's allegations that her supervisors ridiculed her performance or ignored her entirely, denied her request for a transfer, refused to cooperate in recovering valuable property that was stolen from her, forbade her to call the police when another employee physically attacked her, encouraged other insurance agents' sexual harassment of her, suggested that she use sex to make insurance sales and fired her when she reported other employees' fraudulent practices, and that her co-workers ignored her, called her a white racist and threatened her with physical harm

did not state an IIED claim). Moravec and McCameron's alleged conduct – tampering with her belongings, throwing firecrackers at her, making insulting remarks to and about her and engaging in a physical altercation with her - do not rise to the level of outrageousness required to state an IIED claim. Thus, even if these claims were timely, they would still have to be dismissed.

## Conclusion

For the reasons set forth above, there is no genuine issue of material fact on: (1) the Title VII disparate treatment claims, the Title VII retaliation claims and the section 1983 claims that plaintiff asserts against the Village; and (2) the IIED claims that plaintiff asserts against Moravec and McCameron. Defendants' motion for summary judgment on these claims is, therefore, granted. There are, however, genuine issues of material fact on: (1) the Title VII harassment claim plaintiff asserts against the Village; (2) the section 1983 harassment claims plaintiff asserts against Klahs, Moravec and McKeever; and (3) the assault, battery and false imprisonment claims that plaintiff asserts against McCameron. Defendants' motion for summary judgment on those claims is, therefore, denied. Defendants' motion is also denied as to the IIED claims plaintiff asserts against the Village, McKeever and Klahs, which are dismissed for lack of subject matter jurisdiction. Both parties' motions to strike portions of their opponent's fact statement are denied.

ENTER:

UNITED STATES DISTRICT JUDGE

DATED: _August 30, 2002_

-32-